CHRISTOPHER ABBOTT *vs.* NEW YORK AND NEW ENGLAND RAILROAD COMPANY.

GEORGE EDWARDS *vs.* SAME.

ELIZABETH COMSTOCK *vs.* CHARLOTTE P. CHAMBERLAIN.

WILLIAM COMSTOCK *vs.* WILLIAM EDWARDS.

Worcester.   Oct. 5, 1887. — Jan. 4, 1888.   C. ALLEN & KNOWLTON, JJ., absent.

Under the Gen. Sts. c. 63, § 45, providing that, after a railroad " corporation has by virtue of its charter taken land or other property for the purpose of its road, it shall, before proceeding to construct the road, furnish a plan of the land to the owner," and that, if such plan is not so furnished, all the rights of the corporation to enter upon or use such land, except for making surveys, shall be suspended until it has delivered a plan, the failure to deliver a plan of land taken does not invalidate the taking; and a person whose land has been taken cannot, after the road has been completed and has been in use for nearly twenty years, object to such use on the ground that no plan has been furnished him.

Although the power to take land by the right of eminent domain which has been granted by the Legislature to a domestic railroad corporation will not pass to a foreign corporation, which by deed succeeds to the rights and powers of the domestic corporation, without the assent of the Legislature, such assent may be gathered by implication from a series of acts of the Legislature.

HOLMES, J.   The first two cases are actions of tort in two counts, one in trespass, the other alleging the obstruction of a right of way.   The alleged trespass consists of the use of a strip of land, five rods wide, by the defendant for its road across the farm of each of the plaintiffs, and is admitted, unless the defendant has a valid location under the statutes of this State.   The other count is of less importance, and will be referred to later.

The defendant is the successor of the Boston, Hartford, and Erie Railroad Company, St. 1873, *c.* 289, and the location

principally relied on is a location five rods wide made by that company on March 30, 1866. At that time that company was a Connecticut corporation only, and held no charter from this Commonwealth. It had taken a deed from the Southern Midland Railroad Company, (whose projected road ran through the premises in question,) purporting to convey the franchises and property of the latter, and certain acts had been passed by the Legislature; but the plaintiff contends that nothing had been done sufficient to confer upon a foreign corporation the power to take land by eminent domain, and that, if enough had been done, the Boston, Hartford, and Erie Railroad Company did not comply with conditions precedent attached to the exercise of such power.

The last objection may as well be disposed of at the outset. It appeared that plans of the land taken were prepared and furnished by the company to all land-owners who demanded them, and to no others. It did not appear that they were furnished to the owners of the plaintiffs' farms. It is argued for the plaintiffs that the burden was on the defendant to show that it had delivered plans to all owners of land taken, or at least to the owners of the plaintiffs' farms, whether demanded or not, and however long after the event, to save its use of their lands from being deemed a trespass. But if the requirement of the Gen. Sts. *c.* 63, § 45, to "furnish" a plan, means more than deliver on demand, as to which we express no opinion, the plan, by the words of the section, is not to be furnished until after the corporation has taken the land, and the title of the corporation is not affected by failure to furnish it, but only the right to enter upon and use the land, which is suspended, except for making surveys, until the plan has been delivered. After the road is built, the plan is no longer necessary or useful. *Charlestown Branch Railroad* v. *County Commissioners*, 7 Met. 78, 83. And whatever might have been the merits of the plaintiffs' case had they or their predecessors objected to the use of the land when the railroad was first laid out, and when the right to object could and would have been at once removed, it is too late for them to take the objection now, when the road has been constructed and in operation for nearly twenty years. See *Dietrich* v. *Murdock*, 42 Mo. 279.

The question of the power of the Boston, Hartford, and Erie Railroad Company to make the location of 1866 is more difficult. The Southern Midland Railroad Company, which sold to the Boston, Hartford, and Erie Railroad Company, was the Midland Land Damage Company, with a changed name. St. 1863, c. 116. The Midland Land Damage Company was incorporated by the St. of 1861, c. 155, and was made up of parties having claims for land damages against the Midland Railroad Company. It was given general railroad powers for the purpose of completing its road, § 3, and was authorized to purchase the franchise and property of the Midland Railroad, § 7 ; and although it would seem not to have completed the purchase when the St. of 1862, c. 126, was passed, " to extend the time for locating and constructing the Midland Railroad," it appears to have done so before the St. of 1863, c. 116. (In the third case, the deed was put in, dated June 14, 1862.) The Midland Railroad Company was incorporated by the St. of 1858, c. 60, with general powers, including that of taking land by eminent domain, and also with special power to buy out the Boston and New York Central Railroad Company. By § 2, for the purpose of completing the said railroad, it was to have all the rights to which the last-named company was then entitled. It made the purchase on November 1, 1858. The Boston and New York Central Railroad Company was successor, by consolidation, to the powers of the Southbridge and Blackstone Railroad Company, which was incorporated by the St. of 1849, c. 194. (Sts. 1852, c. 158; 1854, c. 447. *Boston & Providence Railroad* v. *Midland Railroad*, 1 Gray, 340.) As such successor, it had made a location three rods wide over the locus on August 5, 1854. And as this was assumed by the counsel for the plaintiffs to have been valid, subject to the objection just disposed of, we shall make the same assumption.

To repeat. The Boston, Hartford, and Erie Railroad Company's grantor, under a changed name, was the purchaser of the franchise and rights of the Midland Railroad Company. The Midland Railroad Company was given general powers, and succeeded to all the powers of the Boston and New York Central Railroad Company, including the powers of the Southbridge and Blackstone Railroad Company. Assuming the three-rod wide

location of the Boston and New York Central Railroad Company to have been valid, we do not understand the counsel for the plaintiffs to deny that the grantor of the Boston, Hartford, and Erie Railroad Company could have made the five-rod location in 1866, if it had not conveyed away its franchise and property, and if the legislation then in force had applied to it.   St. 1865, *c.* 171.   Gen. Sts. *c.* 63, § 38.   *Boston & Providence Railroad* v. *Midland Railroad, ubi supra.*   We do not understand that the location of 1866 was without the limits prescribed by the St. of 1849, *c.* 194, § 2.

Before examining the powers of the Boston, Hartford, and Erie Railroad Company more specifically, it will be well to advert to one or two general considerations.   It was conceded by the plaintiffs' counsel that the power to take land by eminent domain may be given to a foreign corporation.   When the use for which land is taken is otherwise a public use, such as a railroad within the State granting the power, the use is not the less public because the owners are domiciled or incorporated out of the State.   In *In re Townsend,* 39 N. Y. 171, it was held that the power could be given to a company in another State in aid of a canal which also was in another State.   And the proposition which we have laid down has never been doubted, so far as we know, by any court of last resort.   *New York & Erie Railroad* v. *Young,* 33 Penn. St. 175.   *State* v. *Sherman,* 22 Ohio St. 411, 434.   *Southwestern Railroad* v. *Southern & Atlantic Telegraph Co.* 46 Ga. 43, 51.   *Gilmer* v. *Lime Point,* 18 Cal. 229, 251, 255.   See *Clark* v. *Barnard,* 108 U. S. 436, 452.

The decision of this court in *Burt* v. *Merchants' Ins. Co.* 106 Mass. 356, that the power could be conferred upon the United States government, is criticised in *Kohl* v. *United States,* 91 U. S. 367, 373 ; see also *Darlington* v. *United States,* 82 Penn. St. 382; *Van Brocklin* v. *Tennessee,* 117 U. S. 151, 154 ; but the criticism is not applicable to a case like the present.

It seems to us equally clear that a corporation by consent of the Legislature may take this power as quasi successor of another corporation to which it was originally granted, and it is not very material whether the legislative consent be regarded as authorizing a transfer of the old power, or, more strictly, as delegating a new power in the same terms as the old.   See *State* v.

*Sherman*, 22 Ohio St. 428. The substance of the transaction is seen in cases of consolidation. *Boston & Providence Railroad* v. *Midland Railroad, ubi supra.* But there is nothing in reason to confine it to such cases. See *Atkinson* v. *Marietta & Cincinnati Railroad*, 15 Ohio St. 21; *Coe* v. *Columbus, Piqua, & Indiana Railroad*, 10 Ohio St. 372, 387. *Hall* v. *Sullivan Railroad*, 21 Law Rep. 138, 141.

When the power is claimed under the form of a transfer rather than of original grant, the legislative consent or grant may be inferred somewhat more readily than where the whole question is new, because the Legislature has already adjudicated the use to be public, and has granted a coextensive power. See *Black* v. *Delaware & Raritan Canal*, 7 C. E. Green, 130, 402. For, while it is very plain that the power in this Commonwealth could not be transferred to, or exercised by, a purchaser from the original donee, without such consent or grant, (*Braslin* v. *Somerville Horse Railroad*, 145 Mass. 64, 67, *Commonwealth* v. *Smith*, 10 Allen, 448,) the reasons which have led some courts and judges to doubt the need of such consent for the transfer of franchises show that the *delectus personarum* is of little more than theoretical importance, and is the least determining element in the more common cases where the power is conferred. *Shepley* v. *Atlantic & St. Lawrence Railroad*, 55 Maine, 395, 407. *Kennebec & Portland Railroad* v. *Portland & Kennebec Railroad*, 59 Maine, 9, 23. *Miller* v. *Rutland & Washington Railroad*, 36 Vt. 452, 492. *Bickford* v. *Grand Junction Railway*, 1 Sup. Ct. of Canada, 696, 738. And this reasoning is of equal force whether the power to take land by eminent domain is properly called a franchise or not. *Coe* v. *Columbus, Piqua, & Indiana Railroad, ubi supra. Chicago & Western Indiana Railroad* v. *Dunbar*, 95 Ill. 571. *Pierce* v. *Emery*, 32 N. H. 484, 507, 511, 513.

Finally, the legislative consent may be expressed by way of ratification of what purports to be a transfer already executed. *Shaw* v. *Norfolk County Railroad*, 5 Gray, 162, 180; *S. C.* 16 Gray, 407, 410. *Galveston Railroad* v. *Cowdrey*, 11 Wall. 459. And it may be gathered by implication from a series of acts. *East Boston Freight Railroad* v. *Eastern Railroad*, 13 Allen, 422.

At the time of the attempted transfer by the Southern Midland Railroad Company to the Boston, Hartford, and Erie Railroad

Company, the former had power, by the St. of 1861, *c.* 155, § 7, to purchase and enjoy " all the rights and privileges " of the Midland Railroad Company, and to "use, enjoy, lease, sell, or convey the same to any other railroad company." And, inasmuch as from an early date it had been contemplated that the road would not only connect with roads outside the State, but that the corporations within and without the State might unite, (Sts. 1850, *c.* 268, § 9 ; 1852, *c.* 158 ; *Boston & Providence Railroad* v. *Midland Railroad*, 1 Gray, 358 ;) it was not very extraordinary if the parties concerned assumed that the power to sell was not confined to domestic purchasers, especially as in the next line a purchase of cars jointly with connecting roads was allowed, showing that other corporations beside those of this State were in the mind of the Legislature. It was hardly less natural that it should be assumed that the Legislature intended the purchaser to stand in the seller's shoes, and to have whatever powers the seller would have had if the sale had not been made.

The two acts next to be cited, both passed before the location by the Boston, Hartford, and Erie Railroad Company, either show that this construction of the St. of 1861 is the true one, (*Kohl* v. *United States*, 91 U. S. 374,) or else sufficiently express the consent of the Legislature. By the St. of 1865, *c.* 171, " The time for locating and constructing the road of the Boston, Hartford, and Erie Railroad Company, is hereby extended to " May 1, 1868. The St. of 1865, *c.* 275, authorizes the same road to secure any bonds issued under its Connecticut charter " by mortgage of its railways, property, rights, and franchise, or any part thereof, purchased or acquired by contract or arrangement with the Southern Midland Railroad Company, . . . . situate and being in this Commonwealth, . . . . provided, that nothing in this act contained shall in any way affect any claim, or any remedies, . . . . which any person may have against said corporation or any other railroad corporation, . . . . for damage caused to such person by the taking of the land or any part thereof included within the location of said corporations, or any or either of them, or by the laying out, making, and maintaining a railroad over the same." See also St. 1864, *c.* 310.

After reading these acts, we cannot doubt that the Legislature believed that the purchase by the Boston, Hartford, and Erie

Railroad Company was valid, and intended that it should be, and that the purchaser should have the rights and powers which the seller had previously possessed. The latter statute in terms saves claims against the purchaser for damage caused by the taking of land. The former gives it three years to locate and construct its road. The word "locate" is a term of art, in using which the Legislature can have had but one meaning. As was said by Chief Justice Shaw about this very road, "The effect of the location is to bind the land described to that servitude." *Boston & Providence Railroad* v. *Midland Railroad*, 1 Gray, 360. See also Gen. Sts. c. 63, §§ 17, 18. *Hazen* v. *Boston & Maine Railroad*, 2 Gray, 574. *Charlestown Branch Railroad* v. *County Commissioners*, 7 Met. 78. Moreover, the Legislature intended that the power to locate should be exercised by the Boston, Hartford, and Erie Railroad Company, as quasi successor to its vendor; for the power is given in the form of an extension of the time previously allowed, referring, of course, to the statute giving the vendor until May 1, 1863, for the same purpose. St. 1863, c. 116, § 2. See, further, St. 1862, c. 126, "An act to extend the time for locating and constructing the Midland Railroad;" and Sts. 1861, c. 44; 1860, c. 44; 1859, c. 23; 1858, c. 13; 1857, c. 32; 1856, c. 33; 1855, c. 115; 1854, c. 447; 1851, c. 134; 1849, c. 194, § 2.

If there had been no consolidation, and the transfer had been direct from the Southbridge and Blackstone Railroad Company to another Massachusetts corporation, we hardly can suppose that it would have been argued that the purchaser had not the same powers to take land and to complete the road that the Southbridge and Blackstone Railroad Company would have had, if its time had been extended by similar words before the sale. No doubt, the expression of the Legislature's belief and intent might have been plainer. But the St. of 1865 was passed before *Commonwealth* v. *Smith*, *ubi supra*, was decided, and when the need of such expression was less accurately understood. If, however, the intent can be discovered, that is enough. And if the intent would be clear in the case which we have supposed, it is clear notwithstanding the facts that the grantor was formed by consolidation of different lines, and that the grantee was a Connecticut corporation. So far as the former fact is concerned,

the St. of 1863, *c.* 116, § 2, had already fixed a common time, by extension, for finishing all parts of the line; and, as to the latter, the statutes, by treating the Connecticut corporation as a successor to its vendor, impliedly but plainly subjected it to the conditions to which its vendor was subject with respect to the power of taking lands.

We repeat, that it is immaterial whether the purchaser in strict theory receives this power by transfer or by a new grant.   For if the grant to the purchaser is of a power limited and qualified, as if it had been the same power conferred on the vendor and taken by succession, the rights of landowners are as fully protected as they were against the vendor, except so far as the fact that the purchaser is a foreign corporation necessarily makes a difference.   In this case that fact made no difference.   The landowners could have required security of the Boston, Hartford, and Erie Railroad Company, as well as of the Southern Midland Railroad Company, and they had the same means of compelling both security and payment in the one case as in the other, by stopping the use of their land.   Gen. Sts. *c.* 63, §§ 32–34, 39.   See *Drury* v. *Midland Railroad,* 127 Mass. 571, 576.

We pass now to the acts of the Legislature subsequent to the location in question.

The St. of 1866, *c.* 142, approved April 12, ratifies the mortgage made under the St. of 1865, *c.* 275, and provides for the exchange of bonds secured by former mortgages, and for the recording of the mortgage.

The St. of 1866, *c.* 266, approved May 26, about two months after the location, authorizes the Boston, Hartford, and Erie Railroad Company to locate, construct, and maintain a road of about six hundred feet to the Rhode Island line.   There are no express provisions for compensation.   It is assumed, of course, that the power is subject to the General Statutes.

The St. of 1866, *c.* 278, § 5, authorizes the company to construct a railroad from its "chartered line" in Newton to its "chartered line" in Somerville.

The St. of 1867, *c.* 75, incorporating the Roxbury Branch Railroad Company, authorizes the corporation to transfer its franchise, property, and all its rights to the Boston, Hartford, and Erie Railroad Company; and other statutes give like powers to

other corporations. St. 1867, *c.* 133, § 5; *c.* 170, § 14. St. 1868, *c.* 35, § 8. St. 1869, *c.* 406.

The St. of 1867, *c.* 284, authorizes a loan from the State to the company of $3,000,000, for the purpose of aiding it to complete its railway from Boston to Fishkill, New York, with elaborate conditions.

By the St. of 1868, *c.* 145, the company "heretofore created in the State of Connecticut, . . . . and acting within this Commonwealth and recognized by acts heretofore passed by its Legislature, is hereby declared to be a corporation by that name, and vested with all the franchises, powers," etc., set forth in the general laws, "and the acts of said company in forming a union or connection with one or more railroad companies in the States of Rhode Island, Connecticut, and New York," to connect Boston with the Erie Railway Company in New York by a continuous line, are ratified. This seems to be intended to make the corporation a Massachusetts corporation (St. 1874, *c.* 334), and to ratify unions with other roads. The act then continues, "and the said Boston, Hartford, and Erie Railroad Company is hereby substituted in the place and vested with all the franchises, rights, property, and powers, and is subject to all the duties and liabilities, of the Southern Midland Railroad Company," &c. This part of the statute sanctions, in terms, such a substitution as we have construed the earlier acts to sanction by fair implication, and shows very plainly what was in everybody's mind from the beginning. If our construction is right, the act is simply declaratory and passed *ex majori cautela*.

The St. of 1869, *c.* 450, increases the amount of State aid to the road to $5,000,000. The St. of 1869, *c.* 456, authorizes bonds and a mortgage of lands and flats. The St. of 1871, *c.* 372, authorizes the foreclosure of a mortgage to the Commonwealth.

The St. of 1873, *c.* 289, ratifies the proceedings of the bondholders of the Boston, Hartford, and Erie Railroad Company in organizing the defendant, and authorizes the new corporation to acquire all the rights, powers, and franchises of the former company, and to make a new mortgage of "its railroads, property, and franchises." We may remark here, — with reference to a suggestion, thrown out in the last two cases, that the defendant did not succeed to all the rights of the Boston, Hartford, and Erie

Railroad Company because its title was derived in part from foreclosure of a mortgage which was dated a few days before the location, — that, if the suggestion could help either the plaintiffs in the first two cases or the defendants in the last two, and if it is not answered by this statute, it is by the fact that the mortgage covered subsequent locations, (see 107 Mass. 3, note,) and was ratified in that form, as we have seen, by the St. of 1866, *c.* 142.

Finally, the St. of 1873, *c.* 289, ratifies the proceedings of the bondholders of the Boston, Hartford, and Erie Railroad Company in organizing the defendant, and authorizes the new corporation to acquire all the rights, powers, and franchises of the former company, and to make a new mortgage of "its railroads, property, and franchises." The St. of 1874, *c.* 334, dissolves the Boston, Hartford, and Erie Railroad Company, saving all rights.

It thus appears that for twenty years the Commonwealth has constantly dealt with this corporation and its predecessor as having a good title to the road, and as having possessed the powers which they assumed to exercise. The Commonwealth has advanced a large sum of money on that assumption. For nearly twenty years before these actions were brought the plaintiffs have acquiesced in the same view, while the road over their lands has been in public operation. Meantime the mortgage was made, and the bonds were sold in the market. We think that courts should be slow to pronounce the Legislature to have been mistaken in its constantly manifested opinion upon a matter resting wholly within its will, when for so long a time everything has been conducted upon that footing. But we are satisfied, for the reasons which we have given, that the opinion of the Legislature was correct, and that the Boston, Hartford, and Erie Railroad Company must be taken to have had the power and right to make its location of July 30, 1866.

It was admitted that, if the five-rod wide location of 1866 was valid, the claims of the plaintiffs to rights of way must be abandoned. The alleged adverse use had not continued for twenty years across the five rods. It would be too refined to say, and it was not argued, that the adverse use, if any, of a way across the three-rod location of 1854, begun before the widening, ripened

into a right of way across the original three rods after the widening, and carried with it a necessary right of access across the strips on either side which made the residue of the five rods. For, without admitting that there would have been any such right·of access across the outside strips had a right of way existed across the three rods before the widening, it is enough to say that, as no rights had been acquired at that time, the new location gave the railroad company the right to the exclusive use of the land taken, and thus interrupted, for a moment at least, any adverse user, and made a fresh start necessary as to the whole.    *Old Colony Railroad* v. *Miller*, 125 Mass. 1, 5. *Smith* v. *New York & New England Railroad*, 142 Mass. 21, 22.

It follows that the rulings of the court below, that the locations were valid, and that the plaintiffs' evidence failed to show an adverse use of the crossings for a period of twenty years before the obstruction of them by the defendant in 1885, were correct, and that, by the terms of the report, judgment must be entered on the verdicts.                    *Judgment on the verdicts.*

The last two cases are actions for breach of covenant of warranty, the eviction complained of being by the same location of 1866.   The only question seriously argued is whether that location was valid, as the court ruled.                    *Verdicts to stand.*

*A. J. Bartholomew & D. Manning, Jr.*, for the plaintiffs in the first two cases.

*F. P. Goulding*, (*R. M. Saltonstall* with him,) for the New York & New England Railroad Company.

*J. M. Cochran*, for the plaintiffs in the last two cases.

*R. Hoar*, for the defendant in the third case.

*A. J. Bartholomew*, for the defendant in the fourth case.