NEWBURYPORT WATER COMPANY *vs.* CITY OF
NEWBURYPORT.

Essex.   March 18, 19, 1897. — June 14, 1897.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, & BARKER, JJ.

*Interpretation of Rule to Commissioners — Report to the Court — Statute — Valuation of the Property of a Water Company purchased by a City — Evidence — " Net Earnings " — " Tax Returns " — Rates of Insurance — Costs.*

Where a rule is given by statute to commissioners to determine the fair value of the property of a water company for the purposes of its use by a city which is authorized to purchase it, the award of the commissioners when accepted by this court to be final, it is proper that the manner in which the rule has been interpreted and carried out should be reported for the supervision of the court before the acceptance of the report of the commissioners.

Under St. 1894, c. 474, entitled " An Act to provide for the purchase of the property of the Newburyport Water Company by the city of Newburyport," it is proper that no allowance should be made for the city's right to lay and maintain pipes in the streets and its right to collect water rates.

Where it is the duty of commissioners under a statute to find the fair value of the property of a water company for the purposes of its use by a city, which is authorized to purchase it, and they are to find that value " without enhancement on account of future earning capacity or good will, or on account of the franchise of said company," the exclusion of evidence of the net earnings of the company in the past, at a hearing on a petition by the company for a valuation of the property so purchased by the city, is not a sufficient ground for recommitting the report of the commissioners.

Where the officer who made the tax returns setting forth the value of the stock of

a water company is called by that company at a hearing on its petition for a valuation of its property, which has been purchased by a city, and testifies to the value of that property, on cross-examination the respondent may be allowed to identify the tax returns made by him and to put them in, if they have some tendency to show a smaller value of the property than that given on the stand by the witness, and so to contradict him.

At a hearing before commissioners on a petition by a water company for a valuation of its property purchased by a city conformably to a statute, the respondent introduced evidence that a few days before the transfer to it of the property of the company the rates of insurance were advanced in the city because of defects in the water system. *Held,* that its introduction did no harm beyond tending to prove that the water works were not as good as the average, a fact which if proved could hardly affect the valuation as the commissioners arrived at it.

At a hearing before commissioners on a petition by a water company for a valuation of its property purchased by a city conformably to a statute, evidence having been introduced as to the price obtained by the contractor, who built the works for the company and who owned most of the stock, for some of his shares sold by him soon after the works were constructed and a number of years before the petition was brought, the court said that it was not prepared to say that the evidence was inadmissible, but it gave a value for the total property so far away from the award that it was not necessary to discuss the question, since it was not adopted as a standard.

At a hearing before commissioners on a petition by a water company for a valuation of its property purchased by a city conformably to a statute, evidence of the sum paid by the city after the property was conveyed to it to a person for the use of his spring, as bearing on the value of the water, having been admitted, the court said that the evidence did not appear to be open to the objection that his acceptance of the sum was compulsory, or that it was very different from the price paid by the petitioner for water from the same spring not long previous to the conveyance.

It is within the power of commissioners appointed under a statute to determine the valuation of the property of a water company purchased by a city to award the costs of the reference.

PETITION under St. 1894, c. 474, for the appointment of three commissioners to determine the valuation of the petitioner's water plant purchased by the respondent city.*    The court

---

* Sections 1 and 2 of St. 1894, c. 474, are as follows:

" Section 1.    If, within thirty days after the passage of this act, the Newburyport Water Company shall notify the mayor of the city of Newburyport in writing that it desires to sell to said city all the rights, privileges, easements, lands, waters, water rights, dams, reservoirs, pipes, engines, boilers, machinery, fixtures, hydrants, tools, and all apparatus and appliances owned by said company and used in supplying said city and the inhabitants thereof with water, said city shall not proceed to supply water to itself or its inhabitants, under the authority of chapter four hundred and seventy-one of the Acts of the year eighteen hundred and ninety-three, unless it shall have first purchased of said company the property aforesaid; and said company is authorized to make sale of said property to said city, and said city is author-

appointed Everett C. Bumpus, John R. Freeman, and John W. Ellis, commissioners, and they made the following report:

The company, acting under St. 1880, c. 235, entitled "An Act to incorporate the Newburyport Water Company," built its water works and supplied water to the inhabitants of the city of Newburyport from 1881 until the transfer of the property to the city on January 29, 1895.   At this time the company was supplying 2,246 takers, by means of which some seven tenths of the population of the city were receiving water for domestic purposes; and the city, in its municipal capacity, was being supplied for fire purposes under a contract it had made with the company. The water takers connected their respective premises with the system by undergoing the expense of having a pipe run upon their premises to their buildings from the company's mains and service branches in the streets, the company paying all other expenses in making such connections.   The net income derived by the water company from its works in 1894 was $31,180.56. The company, since 1881, had laid in the streets of the city

ized to purchase the same.   Whenever said city shall, by a majority vote of the legal voters of said city present and voting thereon at a meeting called for that purpose, vote to purchase said property, notice of the desire of said company to sell the same having been given as hereinbefore provided, said company shall within twenty days after the vote aforesaid execute and deliver to said city proper deeds and instruments in writing, conveying to said city the property aforesaid, and said property thus conveyed shall thereupon become the property of said city, and said city shall pay to said company the fair value thereof, to be ascertained as hereinafter provided.   If at the first meeting a majority of the voters present and voting do not vote to purchase said property, other meetings may be called and held therefor.   In case the said city and the said company shall be unable to agree upon the value of said property, the Supreme Judicial Court shall, upon application of either party and notice to the other, appoint three commissioners, two of whom shall be skilled engineers and the third learned in the law, who shall determine the fair value of said property for the purposes of its use by said city, and whose award, when accepted by the court, shall be final.   Such value shall be estimated without enhancement on account of future earning capacity or good will, or on account of the franchise of said company.

"Section 2.   In case said Newburyport Water Company shall convey its property to the city of Newburyport, in accordance with the provisions of the preceding section, said city shall manage and use the property thus conveyed for the purposes and under the provisions of chapter four hundred and seventy-one of the Acts of the year eighteen hundred and ninety-three."

many miles of its piping, its hydrants, and other appliances used in connection with the water plant.

The award was made upon the following principles:

"Section 1 of chapter 474 in terms directs us to put a fair value upon the property for the purposes of its use by the city, and further provides that this value shall not be enhanced on account of the future earning capacity or good will, or of the franchise of the company. To determine the fair value of the property for the purpose of its use by the city, as to any part that had any value in use to the city, we have valued the same at its value for that use at the time of the transfer. We have, as we think the statute so directs us, excluded from consideration the future earning capacity and good will of the plant, and have not valued any franchise right whatever which the company owned or held at the time of the transfer, except its rights to take water as acquired and exercised by the taking under St. 1880, c. 235, § 2. Neither have we, for the same reason, taken into consideration the earning capacity, whether past, present, or future, or any income which the company had or might have derived from its plant.

"Subject, then, to these rules, we have valued the property in its entirety as a plant in full operation, engaged in supplying its water for domestic and municipal purposes, and in so doing we have taken into consideration the following elements of valuation, and excluded all others:

"1. Cost of reproduction of all that part of the physical plant used in pumping and delivering water, less any depreciation. This method was employed without objection by all the experts who testified.

"We have further valued the following:

"2. All lands and buildings and easements in and to lands used for piping, and other appliances of the Water Company, not included within the real estate connected with the pumping station.

"3. The personal property.

"4. All books and plans conveyed to the city.

"5. Water collected in the reservoir and wells upon the date of the transfer.

"6. The water right of the company, taking into account not only the land, reservoir, dams, and everything else that created

the water right, but also the quantity and quality of water that gathers at this point, and its adaptability to the purposes for which it was in use when sold.

" We have valued this right at what we have deemed it was worth for the purposes of its use by the city, taking into account its capacity, adaptability, usefulness, and connection with and relation to the plant, and having regard to the fact that we are valuing, not what income its water had yielded or might yield in conjunction with the rest of the property, but the value of the right to have water gather at this place to be used for such purposes. It appeared upon the evidence presented that there was only one other practicable source of supply that could be availed of to supply the city and its inhabitants with the same quantity of water that had been supplied by the company, and some question was made as to the quality coming from this source. We heard evidence offered as to the probable cost of creating and maintaining a water right at this source to take the place of the water right used by the company, and, with the other elements above referred to, have taken this evidence into consideration in passing upon the value of the water right conveyed to the city.

" 7. We further find that the plant was a going concern and in full operation at the time of the transfer, — one that had been tested by experience and with which the city could begin the immediate prosecution of the business of supplying water to the established connections for domestic and municipal purposes (including in the latter hydrant service), — and upon an examination of these facts are of opinion that the property had a greater value for the purposes of its use by the city by reason thereof, than if the plant had not been in full operation, and that this should be considered in passing upon the value of the entire plant. This enhancement we have fixed upon as adding to the value of the property the sum of $40,000. In passing upon the same, we have not made the income derived from the business its element or basis, or any other factor than that above stated."

They further report that, " In estimating the value of the property transferred, we allowed for the cost of reproducing this piping, these hydrants, and other appliances, as appears in clause 1 of our elements of valuation; but we have not, in that element or in any other of the elements of valuation, taken into consider-

ation or valued the exercise of this right, or the right itself, to so use the streets up to the time of the transfer; and whether or not we should so value we leave to the determination of the court, further stating that, upon the evidence presented to us, the exercise of this right and the right itself were valuable. It did not appear upon the evidence presented that the company paid anything to the city for this right, unless it formed part of the consideration of the company's supply of water to the city under a contract made between the city and the company to so supply, but the evidence upon this question was not so definitely presented as to enable us to determine whether it entered into the consideration or not."

They thereupon found that the fair value of the property, for the purpose of its use by the city, upon January 29, 1895, was $275,000, with interest.

After this finding, at the request of the parties, and upon their agreement made in the course of the hearing that any questions of law raised by either party should, at the request of such party, be reserved for the consideration of this court upon the question of the acceptance of the award, certain reservations so made by the parties were reserved, all of which were subsequently waived by the parties except the following, which were reserved at the request of the petitioner.

1. The petitioner called John E. McCusker, superintendent, clerk, assistant treasurer, and a director of the company, who had always kept or supervised the keeping of its books and accounts, who testified concerning the construction of the work, the business of the company, fitness of the works for the use of the city, value of the personal property, and other subjects, by whom it appeared that the works were originally built by George H. Norman in 1881, under a contract with the company, the contract price being $295,000. The company had an authorized capital of $300,000, divided into 3,000 shares, each with a par value of $100. 2,902 shares of the stock were issued in 1881 to Mr. Norman, who is and always has been the treasurer and the largest stockholder of the company, in payment for the work of construction done under the contract. The respondent, against the petitioner's objection and exception to the admission of same, was permitted to ask McCusker, as part of his cross-examination

and as bearing on the original cost and character of the construction of the works, as to the price at which Norman sold some of his stock in 1882, and how much of his stock was so sold by him, to which he answered that Norman then sold about 2,072 shares at $60 per share. This valuation of the stock was materially less than the value of the property represented by it as claimed by the petitioner in this case. Later, the petitioner, as part of its case in chief, called Norman as a witness, and examined him fully as to the construction of the works and the business affairs of the company, and as an expert on the value of its property; and in the course of his examination by the petitioner and by reason of the fact that McCusker had testified to the same and in explanation of the same, in reply to inquiries by the petitioner's counsel, he testified to the same facts relating to the sales of stock as were testified to by McCusker as above stated, and he further testified to the same facts, without objection, in the cross-examination by the respondent.

2. In cross-examination of Norman, who had testified to the cost of construction of the works and the value of the company's property, the respondent was permitted to identify by him and put in evidence, against the petitioner's objection and exception to the same, the returns for the years 1882 to 1894 inclusive, made under Pub. Sts. c. 13, § 38, signed and sworn to by the witness, as treasurer of the company, to the tax commissioner of the Commonwealth for the purposes of taxation, in which the market value of the stock of the company was stated at different amounts in the various years from $33 to $90 a share, on which basis the property of the company was worth much less than the amount claimed and testified to by Norman. Upon redirect examination, Norman stated that at the time that he made these returns the stock was not selling in the market at all.

3. The respondent, as bearing on the value of the property of the company, especially with reference to fire protection, called as a witness Nevitt S. Bartow, who testified that the New England Insurance Exchange is an association of insurance companies which fixes the rates of insurance in New England, and that he was a member of the executive committee of such exchange and chairman of the committee thereof which had jurisdiction with regard to the fixing of insurance rates in Newburyport and

vicinity. His attention was called to the condition of New-
buryport with respect to the fire protection after a large
fire there, which occurred on October 31, 1894, and that, in
consequence of said fire, he visited Newburyport and made a
personal investigation of the efficiency of the water plant for
fire protection.

The respondent then asked the witness, " Can you tell what
the rates of insurance were in Newburyport in January, 1895 ? "
To which he answered that in January, 1895, the insurance
rates in Newburyport were based upon the efficiency of the water
supply.

He was further asked how the insurance rates of Newburyport
in January, 1895, compared with the standard rates of the New
England Insurance Exchange. He stated that on January 26,
1895, the insurance rates of Newburyport were advanced 25 per
cent over the standard rates established on that date by said
Exchange in other places in the vicinity of Newburyport.

He was further asked, " Was such increase of 25 per cent in
the insurance rates of Newburyport made because of the superior
efficiency of the water plant, or because of supposed inefficiency
of it ? " And the witness answered as follows: " The system
developed certain weaknesses which we considered made the
system inefficient. Grave defects were discovered, which led to
that advance of rate." And he further stated that such advance
took effect upon January 26, 1895, and continued in effect until
May 1, 1895.

It did not appear that the witness was qualified as an expert
to testify in the premises, and the foregoing evidence was not
permitted on that ground, but for the purpose of showing as a
fact that the insurance rates were so advanced for the reasons
stated in the evidence.

To all this testimony of the said Bartow, the petitioner duly
and seasonably objected, and excepted to the admission of the
same.

4. It appeared that there was a water source known as Jack-
man Spring, some 1,500 feet distant from the wells and reservoir
of the company, and that McCusker, early in 1893, had made an
arrangement with one Henry M. Jackman, who did not have a
record title to the land, or any title thereto by possession, so far

as it appeared, or any ownership in said spring, but who claimed to own it, and who exercised some acts of ownership and of possession over the same, by which the Water Company built a dam and made certain excavations upon said land, and in 1893 and 1894 pumped from time to time water from the said spring into the reservoir of the company, the amount so pumped being estimated or approximately determined in the testimony to have been 42,000,070 gallons per year.   The company paid to the said Jackman for the use of the premises, including the water, and for some wood upon the premises, the sum of $275, and took the following receipt therefor: "Newburyport, Jan. 14, '95.   Received of the Newburyport Water Company $275.00 in full of all claims and demands against said company to date.   Henry M. Jackman."

The respondent, upon a claim that it appeared already upon the record, or, if not, the evidence would be forthcoming, that $275 per annum was paid to the said Jackman for said water, as bearing upon the value of the water at the company's works or in its immediate vicinity, against the petitioner's objection and exception duly taken, and in answer to the petitioner's evidence that the water at the company's works was worth from $90 to $150 per million gallons, put the following question to an expert called by it: " Have you made an estimate or a computation of the value or cost of the water of the Jackman Spring, based on the assumption that the right to what has been pumped there for a particular year cost $275?"   And the witness answered, " I made the computation on the basis that the gauging of the stream, Jackman Spring, showed a flow of 118,000 gallons a day, making a net flow for the year of 42,000,070 gallons, and on a basis of payment for the use of that water of $275, it figures $6.55 per million gallons."

· It further appeared that no other person or persons had been paid by the company for the use of the water at Jackman Spring during the time covered by the receipt.

No other evidence bearing on the payment for the use of this water for this time was introduced.

5. The respondent, for the same purpose for which it put the above question, put also the following question to the same witness, against the objection and exception of the petitioner:

" Have you made an estimate or computation of the value or cost of the water of Jackman Spring, based on the assumption that the rights to what has been pumped there for a particular year cost $365, or $1 per day?" And the witness answered, "Eight dollars a million gallons." This question was allowed on the undertaking of the respondent to show that such an arrangement had been made. The only evidence subsequently offered by the respondent on this subject is stated in paragraph 6.

These estimates of value concerning the Jackman Spring were materially less than the estimates for the value of the water from the petitioner's land, given by its witnesses.

6. The respondent called as a witness its superintendent of the water works, and, against the petitioner's objection and exception, was permitted to prove by him that in the spring of 1895 and subsequently to the conveyance from the petitioner to the defendant, he was sent by the Water Board of the city of Newburyport to make an arrangement with Jackman for the use by said city of the waters of Jackman Spring, and that he made a contract with Jackman for such use of said water, by which Jackman was to be paid by the city $1 for each and every day that the water was actually pumped by the city from said spring; and the city pumped water from the spring, under the contract, during this year, for some 126 days, — an average of 144,000 gallons per day.

At the argument before the commissioners, the petitioner asked them to adopt the following propositions :

1. The St. 1893, c. 471, entitled " An Act to supply the city of Newburyport with water," never took effect, because the city had failed and refused to pass the vote to purchase the property of the Newburyport Water Company, as provided for in § 12. (It was admitted that under that act the city duly passed a vote, on August 25, 1893, refusing to purchase the corporate property of the Newburyport Water Company, and that on September 7, 1893, it duly passed a vote to accept said act of 1893. It was claimed by the respondent that the city of Newburyport, by virtue of and upon such vote of acceptance, was thereupon authorized to establish and maintain a system of water supply under and according to said act of 1893.)

2. The city of Newburyport acquired from the Newburyport Water Company all the incorporeal as well as the corporeal property of said company, including therein all the rights, franchises, easements, and privileges of every description belonging to the company.

3. By St. 1894, c. 474, the Water Company was authorized to sell, and the city was bound to buy : (1) all the rights; (2) all the privileges ; (3) all the easements ; (4) all the lands ; (5) all the water ; (6) all the water rights; and (7) all the structures, pipes, machinery, and other personal property used in supplying the city and its inhabitants with water. That such construction should be given to the statute as that every one of these words should have its full force and meaning; that none of them should be treated as vague and meaningless words; but assuming that they were put into the statute as meaning something, if possible, such construction should be given to the statute as should give force and meaning to every one of these words in connection with the other words of the statute.

4. The term "rights and privileges" in St. 1894, c. 474, § 1, included the right of the company to distribute water and collect water rates; it did not mean or include the franchise of the company to be a corporation ; and the term "franchise," as used in the last sentence of § 1, should be construed as meaning only the franchise to be a corporation, or the charter of the corporation.

5. The last sentence of said § 1 did not preclude the commissioners from considering either the past or future earning capacity of the Water Company in determining the value of the property for the purposes of its use by the city of Newburyport, and the past earning capacity of the company should properly be considered by the commissioners in determining the value of the corporate property for its use by the city ; that the term "good will," used in the same sentence of § 1, meant such peculiar and additional value as might pertain to the property by reason of the fact that the city succeeded to the business as conducted by the Water Company.

6. The phrase "the fair value of said property for the purposes of its use by said city" entitled and required the commissioners to determine what could fairly be realized by the city from

the property, and to award an amount which should represent the fair value of the property, including therein all the incorporeal rights, privileges, and franchises belonging to said company.

The commissioners in their report state concerning the same : " We may assume that in so far as the propositions contained in the first three clauses are concerned, they are correct, and the definition of ' good will ' set forth in the fifth clause we accept. Our estimation of the value of the property, however, is based upon the theory that, whether or not the company vested everything in the city described in clause two, we still remain of the opinion that the elements of valuation which we have already herein stated are all that we can take into consideration in making our award, and we have therefore confined ourselves strictly to these elements of valuation, and do not include anything else."

The commissioners further held that they had the power to determine who should pay, and find, as a matter of fact, that the city ought to pay the costs of the reference, and, at the request of the respondent, reserved for the consideration of this court whether they had power in law so to determine.

Hearing before *Barker*, J., who, the petitioner having moved that the report be recommitted to the commissioners, reserved for the determination of the full court the questions whether the award should be recommitted and whether it should be accepted.

*R. M. Morse*, (*F. L. Evans* with him,) for the petitioner.

*A. E. Pillsbury*, (*C. C. Dame & R. E. Burke* with him,) for the respondent.

HOLMES, J. The price to be paid by the city of Newburyport to the Newburyport Water Company for what it purchases under St. 1894, c. 474, is not left to the discretion of the commissioners. A rule is given to them by the statute, and it is not improper that the manner in which that rule has been interpreted and carried out should be reported for the supervision of this court before the acceptance of their report. *Kingman, petitioner*, 153 Mass. 566, 579. We are not disposed to criticise even the reporting of questions of evidence by agreement of parties, so far as it may seem possible that they had a substantial bearing upon the result. But we should not recommit the report upon a matter of evidence unless we could see some probability of an

appreciable change in the report upon the correction of the mistake.

The chief complaint of the petitioner is that no allowance is made for its right to lay and maintain pipes in the streets and its right to collect water rates.   There was much discussion whether these are among the "rights" which the city buys under § 1 of the act, and, if so, whether they are embraced in the provision that the value of the property shall be estimated without enhancement on account of, among other things, the franchise of the company.   As bearing upon this there was a good deal of argument as to whether St. 1893, c. 471, was in force, the city having voted not to purchase the petitioner's property as therein provided, but afterwards having voted to accept the act.   We do not think it necessary to go into these considerations, or even to examine with great accuracy how far the rights in question have not been allowed for.   The direction to " determine the fair value of said property for the purposes of its use by said city " is clear enough without going into controverted questions.   Whatever the city purported to purchase, (see *Abbott* v. *New York & New England Railroad*, 145 Mass. 450, 453, *State* v. *Sherman*, 22 Ohio St. 411, 428, and *Coe* v. *Columbus, Piqua, & Indiana Railroad*, 10 Ohio St. 372, 387,) the petitioner's right to lay pipes in the streets was of no use to the city.   The city had that right by virtue of the legislative authority to furnish water.   Water pipes are not an additional burden to the highway.   *Pierce* v. *Drew*, 136 Mass. 75, 81.   *Lincoln* v. *Commonwealth*, 164 Mass. 1, 10.   And as soon as the city was authorized by the Legislature to furnish water no one could complain if it proceeded to lay pipes for that purpose.   Assuming that the act of 1893 was not in force, and admitting that a purchase from the petitioner was a condition precedent to the exercise of any rights under the act of 1894, still it is plain that, when once the purchase was made, the act of 1894 conferred upon the city directly, and not merely or at all as successor to the Water Company, the right to supply itself and its inhabitants with water, as if under the act of 1893 in case the Water Company had not offered to sell under that act. A similar answer may be made with regard to the right to charge water rates.   St. 1894, c. 474, §§ 2, 4.   St. 1893, c. 471, §§ 1–3, 8, 13.   " It is the statute, and not the company which originally

constructed the [water works], which confers upon the local authority this right." *Edinburgh Street Tramways Co.* v. *Edinburgh*, [1894] A. C. 456, 464, 465.

It must be remembered that the transaction before us springs out of a voluntary offer by the petitioner to sell upon the statutory terms, and therefore there is no reason to try to bend those terms in its favor. Of course, an offer by a water company made under the threat of municipal competition and to avoid ruin, might be voluntary only in name. But we have no reason to assume in this case that the petitioner is the victim of robbery, and must treat it as having acted of its free choice in fact as well as in form.

The other objection most insisted upon by the petitioner is the exclusion of evidence of its net earnings in the past. Had the evidence been admitted, it is improbable that we should have recommitted the report on that ground. We are not disposed to recommit it because the evidence was excluded. The net income no doubt would be an indirect way of getting· at the value of the capital in a transaction between individuals. It is not necessary to say that it would throw no light on the different question which the commissioners had to answer under the statute. But the question was a different one. Their duty was to find the fair value of the property for the purposes of its use by the city, and they were to find it " without enhancement on account of future earning capacity or good will, or on account of the franchise of said company." It is doubtful whether the evidence would not be held inadmissible in England as an attempt to get an allowance for " future earning capacity," although the way in which these words are used in St. 1891, c. 370, § 12, points to a narrow construction of them in the act before us. *Edinburgh Street Tramways Co.* v. *Edinburgh*, [1894] A. C. 456, 466. In this country it has been said that basing the value upon earnings is in effect valuing a franchise which no longer exists. *National Waterworks Co.* v. *Kansas City*, 62 Fed. Rep. 853, 864. Even in an ordinary transaction the test would not be past profits, but market value, if that could be ascertained. *Montgomery County* v. *Schuylkill Bridge Co.* 110 Penn. St. 54, 60. *In re Kensington & Oxford Turnpike Co.* 97 Penn. St. 260. *Stockton & Copperopolis Railroad* v. *Galgiani*, 49 Cal. 139.

Compare "fair market value for the purposes of its use." St. 1891, c. 370, § 12.   At all events, the different conditions under which the property would be used by a municipal corporation seeking only reimbursement, not profit, so diminish the instructiveness of the figures offered that, even if admissible, we think that they ought not to have affected the result.

The commissioners state the elements of valuation which they have taken into account.   In addition to the value of the tangible property and easements, they have allowed forty thousand dollars for the fact that the plant was a going concern and in full operation.   They have allowed for everything for which the petitioner was entitled to be paid.   They have approached the question in a manner in which it was within their discretion to approach it.   *National Waterworks Co.* v. *Kansas City*, 62 Fed. Rep. 853.   If capitalizing profits would give a much greater excess over the value of the land, water easements, and plant of the company than the commissioners allowed, the reasons are to be found in the franchise and monopoly of the company, in its right to lay pipes in the streets, and partly perhaps in the personal skill of the management, none of which are things for which the city is to pay.

The officer who made the tax returns setting forth the value of the stock of the company was called by the petitioner, and testified to the value of the company's property.   On cross-examination the respondent was allowed to identify the tax returns made by him and to put them in.   The returns had some tendency to show a smaller value of the property than that given on the stand by the witness, and so to contradict him, and were admissible on that ground, even if they did not amount to admissions by the corporation itself.

It appears to us questionable at least whether evidence that insurance rates were higher than the standard rates, and were advanced because of defects in the water system, would be admissible before a jury upon a question of value.   Yet as an actual price paid in the market because of a specific fact, the objection to it is, not that it is *res inter alios*, but rather that it is too remote from the question at issue to give much help.   See *Call* v. *Allen*, 1 Allen, 137, 144.   We do not see how it could do any harm beyond tending to prove that the waterworks were

not as good as the average, a fact which, if proved, hardly could affect a valuation arrived at as the commissioners arrived at it.

We are not prepared to say that the price of Norman's stock was inadmissible. But it gave a value for the total property so far away from the award that it is not necessary to discuss the question, since it was not adopted as a standard.

The evidence of the sum paid Jackman by the city for the use of his spring, as bearing on the value of the water, does not appear to have been open to the objection that his acceptance of it practically was compulsory, as in *Cobb* v. *Boston*, 112 Mass. 181, and *Sawyer* v. *Boston*, 144 Mass. 470. It seems not to have been very different from the price paid by the petitioner.

It was within the commissioners' power to award costs. *Jones* v. *Carter*, 8 Allen, 431. *McLaughlin* v. *Old Colony Railroad*, 166 Mass. 260.                    *Commissioners' award accepted.*