Roach, Christine M., J.
This case involves interpretation of an 1879 Charter for purposes of arriving at the proper purchase price for a water company. Defendant Aquarion Water Company of Massachusetts, Inc. (Aquarion Mass.) is the current entity that holds 100% of the stock of the original Hingham Water Company, as well as the water distribution system serving Plaintiff Town of Hingham (Hingham or the Town) and certain other towns. The second Defendant, Aquarion Water Capital of Massachusetts, Inc. (Aquar-ion Capital), owns the water treatment plant also in dispute in this litigation. In its 2012 Town Meeting, the Town voted to appropriate funds to investigate the feasibility of purchasing the water utility assets. The parties are unable to agree on an appropriate formula for calculating the purchase price the Town would be required to pay under the language of the Charter.
The court (Sanders, J.) previously ruled that issues of statutory construction surrounding the 1879 Charter could not be determined on summary judgment and required a trial. Docket, Papers 18-19. The matter was tried to the bench over five days, February 23-26, and March 2, 2015.[1] The court entertained post-trial arguments heard May 23, 2015, in addition to supplemental briefing completed May 5, 2015. Following full consideration of the evidence and all of the parties’ post-trial briefing and argument, I find and rule as follows.
All of the below-enumerated Findings of Fact represent findings by the court, including but not limited to determination of the credibility, weight, and probative value of the evidence adduced at trial and reasonable inferences drawn from that evidence, as well as stipulations by the parties.
Findings of Fact Proceedings
1. The Town filed this declaratory judgment action on July 3, 2013 requesting that the court “construe special legislation, St. 1879, c. 139, enacted March 21, 1879.” Docket, Paper 2.[2]
2. The Hingham Water Company was chartered/incorporated by the 1879 statute “for the purposes of furnishing the inhabitants of Hingham with pure water . . Trial Exhibit 1, p. 489 at section 1. The provisions of the statute control the rights and obligations of the parties before me. Id.; Trial Exhibit 64 (Stipulated Facts), para. 6. The 1879 Charter language at issue is this:
The town of Hingham shall have the right at any time during the continuance of the charter hereby granted, to purchase the corporate property, and all the rights and privileges of said company at the actual cost of the same, together with interest thereon at a rate not exceeding ten per centum per annum, said cost to include all actual loss or damage paid or suffered by said company for injury to person or property, deducting from said cost any and all dividends which may have been paid by said corporation, or at such a price as may be mutually agreed upon between said corporation and the town of Hingham: and the said corporation is authorized to make sale of the same, and this authority to purchase said franchise and property is granted on condition that the same is assented to by said town by a two-thirds vote of the voters present *205 and voting thereon at any annual meeting, or at a legal meeting called for that purpose.
Trial Exhibit 1 atp. 492 (Section 11) (emphasis supplied).
3. Through various historical acquisitions and mergers discussed below, Aquarion Mass is the current entity that owns 100% of the stock of the original Hingham Water Company, and owns the water distribution system that serves both the residents of Hingham and certain other towns. Trial Exhibit 64 at para. 13.
4. The Town has the right to exercise its Section 11 purchase rights, but it has not done so to date. It has not voted by the required 2/3 vote at a Town Meeting or special meeting called for that purpose to proceed with a purchase under Section 11 of the Charter of the corporate property, rights and privileges of the Hingham Water System pursuant to the Charter’s purchase price formula. Trial Exhibit 64 at para. 12.
5. Trial Exhibit 65 is a stipulation of the parties containing the historical financial information of Defendant Aquarion Mass. (Financial Stipulation.) This Financial Stipulation was incorporated by all of the expert witnesses in this matter as part of the factual foundation at trial for purposes of their respective opinions. The Financial Stipulation sets forth the various potential inputs to be used in the calculation to be performed under the 1879 Charter. There is no dispute about the authenticity or reliability of this historical financial information. Dixon Trial Testimony.
6. The definition of the term of art “contributions in aid of construction” (CIAC), and the fact that this property is properly excluded from the calculation of the purchase price under the Charter, are not in dispute.[3]
Early Histoiy of the Water Company
7. Hingham was founded in 1635. The Histoiy of the Town of Hingham, Massachusetts was published by the Town in 1893, and devoted a chapter to the histoiy of the Hingham Water Company, entitled ‘Water-Works” by Charles W.S. Seymour.[4] Trial Exhibit Ex. 64 at para. 1; Trial Exhibit 6. According to trial witness Ms. McCraken, the “first mention of a town water company” was in 1871. McCraken Trial Testimony.
8. As noted in the Histoiy: “At this time Plymouth was the only town in the county that had introduced water . . .” Trial Exhibit 6 at p. 261. Further, “(i]t was doubted if the water could be made to flow over Liberty Pole Hill, or if there was water enough to fill the main pipes, if they should ever be laid: the water was full of snakes and all kinds of impurities, and the pond was so shallow that a two-inch pipe would drain it in a veiy short time if allowed to run continually.” Trial Exhibit 6 at p. 264. In 1871, as reflected in the Town records, it was voted: ‘That a committee of five be chosen to cause survey of Accord pond to . . . ascertain its capacity for supplying the inhabitants with water, also to cause estimates to be as to probable cost for pond laying pipes, and report thereon at some further meeting ...” McCracken Trial Testimony; Trial Exhibit 119.
9. The Hon. John D. Long (Long) served as Town of Hingham Moderator from March 1873 through March 1881. Long was elected Governor of Massachusetts in 1880. Long appointed a committee that procured the passage of legislation that would allow the Town to use Accord Pond for the supply of a water system and served on the 1875-1876 Town committee concerning the water supply. Trial Exhibit 64, paras. 3 and 4; Trial Exhibit 6, p. 264.
10. The Town’s voters rejected, on five separate occasions, warrant articles to build the Town water distribution system: (1) on September 12, 1876 it was defeated 141 to 130; (2) on October 3, 1876, it was defeated 166 to 143; (3) on March 5, 1877, it was “indefinitely postponed”; (4) on August 19, 1878, it was defeated 286 to 249; and (5) on September 2, 1878, it was defeated 323 to 182. McCracken Trial Testimony; Trial Exhibit 64 at para. 5;TrialExhibit6 atpp. 265.These votes were taken at Town Meeting, which is “when all the voters of the town come together to do the town’s business.” McC-racken Trial Testimony; Trial Exhibit 1 at p. 492. The 1879 Charter also gave the Town one final opportunity to construct the works. Under Section 14 of the Act, if the Town voted to build the works within a specified time, then the overall 1879 Charter would be voided. McC-racken Trial Testimony; Trial Exhibit 3 at p. 493. The Town did not do so. McCracken Trial Testimony.
11. Long was the petitioner for the 1879 Charter, as well as an original incorporator under the Charter of the Hingham Water Company. Trial Exhibit 2, page 1; Trial Exhibit 64, para. 7. After incorporation, the Town’s public water distribution system was built, with the ownership and governance consisting largely of Town residents. Trial Exhibit 64, para. 9. Legislative History of Section 11.
12. During the progression of the 1879 statute through the legislature, the interest rate was changed from “a rate of 8%” to “a rate not exceeding 10%.” Trial Exhibit 64 at para. 8; Trial Exhibit 2 at p. 9.
13. In 1938, the Senate of the Commonwealth proposed a material revision to Section II in Senate Bill 406. The new language provided that in the case of purchase, “the town shall assume and agree to pay, and to indemnify and hold said corporation harmless from liability on, any indebtedness of the said corporation incurred ...” It was also proposed that the purchase price be computed by taking the actual cost of the corporate property and “comput[ing] interest at the rate of five percent. . .” (Tr. Ex. 4 at pp. 2-5 (Senate Bill 406). The Senate sought an opinion from the SJC regarding the constitutionality of these proposed changes to Section 11, by asking whether the changes were constitutional, in “authorizing a taking of private property without providing reasonable compensation therefore,” and whether the Charter “set forth the terms of a contract between the town of Hingham and said company,” such that amendment could be unconstitutional in “impairing the obligation of contracts.” Trial Exhibit 5 at pp. 3-4.
*206 14. On April 5, 1938 the SJC issued the Opinion of the Justices, and noted that the “proposed statute [Senate Bill 406] strikes out [Section ll’s] provisions and establishes a new basis for payment in case the town of Hingham exercises its option to purchase the corporate properly of the water company. The basis thus established is a long and complicated computation ...” Trial Exhibit 5 at pp. 4-5. In this context, the SJC found:
The proposed statute provides a method whereby the properly of the water company can be taken by the town . . . The water company, by acceptance of its charter, entered into a contract with the Commonwealth ... By virtue of the reserved right to amend and repeal charters of corporations, the General Court may change the terms of such a charter provided there is no violation of other constitutional guaranties ...
It does not appear that the town was a parly to the contract between the water company and the commonwealth created by St. 1879, c. 139, and its amendments. The town merely has the right to purchase the properly of the water company... In these circumstances, the provision in the Constitution of the United States that no state shall pass any law impairing the obligation of contracts affords no protection to the water company independent of prohibitions against the taking of properly without due process of law and without full compensation. Properly and rights acquired upon the faith of the charter cannot be taken away under the guise of repeal or amendment without full compensation.
In Re Opinion of the Justices, 300 Mass. 607, 612-13 (1938). Further, as to debt assumption, the SJC noted that “[t]he assumption by the town of the indebtedness of the water company secured by mortgage placed on its properly is payment in quite different form from that specified in the charter.” 300 Mass, at 614.
Recent Corporate History of the Water Company
15. In 1989 the Hingham Water Company merged with the water systems located in the towns of Oxford and Millbury. Under the 1989 merger, the Hmgham Water Company assumed all of the assets and liabilities of the Oxford and Millbury systems, and exchanged their respective shares of stock for an equal number of shares in the surviving corporation, the Massachusetts-American Water Company (Mass-American). Dixon Trial Testimony; Trial Exhibit 32.
16. Massachusetts Capital Resources Company (Mass Capital) was formed in 1995 for the sole purpose of acquiring, developing, financing, and leasing the Water Treatment Plant (WTP) which would service the Hingham water system. Trial Exhibit 64 at para. 14.
17. In April 2002, 100% of the stock of both Mass-American and Mass Capital was transferred to an entity known as Aquarion Company, a subsidiary of Kelda Group, Inc. (Kelda). Trial Exhibit 64, at paras. 20, 21.
18. In 2007, Kelda as owner of the Hingham water system sold 100% of the stock of Mass-American (now, Aquarion Mass.) to Macquarie Utilities, Inc. (MUI). Trial Exhibit 64 at para. 25; Trial Exhibit 109.
19. In that same year, MUI transferred 100% of the stock of Aquarion Company into Aquarion Holdings, LLC. Trial Exhibit 64, at para. 25; Dixon Trial Testimony.
20. After this transaction, Mass-American changed its name to Aquarion Mass, and Mass Capital changed its name to Aquarion Capital, Trial Exhibit 64 at para. 22.
21. As a result: MUI owns 100% of the stock of Aquarion Holdings, LLC; Aquarion Holdings, LLC owns 100% of Aquarion Company; Aquarion Company owns 100% of the stock of Aquarion Water Company; and Aquarion Water Company owns 100% of the stock of Aquarion Mass, and Aquarion Capital. Aquarion Mass, is the undisputed owner and successor to the former Hingham Water Company. Aquarion Capital is a single asset entity (owning the WTP), and has no employees. All of Aquarion Capital’s officers and directors are identical to those of Aquarion Mass. Trial Exhibit 10; Trial Exhibit 64 at paras. 14-16, 23-24, 30, 42-43 Trial Exhibit 144, pp. 42-44; Walsh Trial Testimony.
The Water Treatment Plant
22. Mass Capital was set up primarily with debt, keeping the overall cost of the WTP lower than if it had been incorporated into' the Massachusetts utility. Dixon Trial Testimony.
23. John Young is an experienced engineer who spent 33 years working for one of the predecessor companies of American Water. Young was involved with the design, construction and approvals associated with the WTP and the creation of Mass Capital. The WTP was constructed for several reasons: (a) water quality; (b) the need to use surface water to meet demand; and (c) “a consent order from the Massachusetts Department of Environmental] Protection [MDEP] requiring them to build a plant to treat the surface waters supplying the Hingham System for Mass. Am.” The MDEP is the environmental regulator for the state. YoungTrial Testimony; Trial Exhibit 34 (MDEP March 2, 1995 Consent Order).
24. After incurring around $1.4 million in design costs for the plant to be located at Free Street, Mass-American considered locating the plant off Main Street. That plan for a traditional open campus-style plant was met with “significant opposition” from the Town’s Zoning Board of Appeals and local Hingham residents. Mass-American then moved the plant to a site further away from the residents on the Main Street site and implemented a “new design”—a “stealth treatment plant” that could not be heard, seen or smelled. The restrictions on construction of the WTP were included in a conditional permit by the Town of Hingham Zoning Board of Appeals dated October 17, 1991. Trial Exhibit 33; Altland Trial Testimony; Young Trial Testimony.
25. Mass-American started construction of the WTP in 1994 because of the impending deadline from the MDEP. It did not form Mass Capital until construction was underway because the bond offering needed cer *207 tainty on the final cost figures. The total cost of the WTP was significant compared to the Mass-American system, and would have caused violations of the company’s mortgage indenture obligations. Mass-American sold the partially completed plant to Mass Capital in early July 1995, when it was 45% complete and at the maximum allowable debt level that Mass-American could incur. Young Trial Testimony. The Bond Offering statement for the WTP provides:
Mass-Am (including its predecessors) has operated in Hingham pursuant to a special legislative act (the “Charter”) granted by the Legislature of the Commonwealth in 1879 . . . Peabody & Brown, counsel to Mass-Am, is of the opinion that, if the Town of Hingham were to acquire Mass-Am’s system in Hingham and Hull pursuant to the compulsory purchase provision of the Charter, Mass-Am’s leasehold estate as lessee under the Facility Lease would constitute corporate property and rights which the Town would be required to acquire and succeed to as lessee. If the Town of Hingham succeeds Mass-Am as lessee under the Facility lease pursuant to the Town’s acquisition of Mass-Am’s corporate property under the Charter (a “Hingham Lessee Succession”), the Facility Lease provides that the Town of Hingham will acquire substantially all of the rights, duties and obligations of the Lessee under the Facility Lease .. .
Trial Exhibit 12 at p. AQ-025659 (emphasis supplied).
26. Mass Capital and Mass-American entered into a ground lease because Mass-American owned the land upon which the WTP is located. The entities also entered into a facility lease (the Facility Lease), under which Mass-American would lease the WTP from Mass Capital for a term of years, with the lease expiring on December 1, 2035. Trial Exhibit 64 at para. 17; Walsh Trial Testimony; Dixon Trial Testimony; Trial Exhibit 13 (Facility Lease Agreement); Trial Exhibit 14 (Ground Lease Agreement); Trial Exhibit 63.
27. The Facility Lease gives the Town the express right to assume it if the Town acquires the water system owned by Aquarion Mass. Trial Exhibit 64 at para. 18.
28. Mass-American asked for DPU approval of its rates and corporate structure in early 1996 through a rate case filing. Hingham participated in that rate case hearing to challenge the cost of the WTP, but did not challenge the entity structure. The DPU issued a rate decision in 1996 approving the structure of Mass Capital (now Aquarion Capital). Trial Exhibit 63. The cost of the design of the Free Street and Main Street sites, of approximately $1.4 million, was not recovered.
29. Through the several historical acquisitions and mergers discussed above, Aquarion Capital is the current entity that owns 100% of the stock of Mass Capital. Trial Exhibit 64 at para. 15. Aquarion Capital is the current lessor to Aquarion Mass of the WTP. Id., at para. 19; Dixon Trial Testimony.
30. In October 2012, Aquarion Mass and Aquarion Capital entered into an Amended and Restatement of the Facility Lease Agreement (Restated Facility Lease). Dixon Trial Testimony; Trial Exhibit 15. The net effect of this Restated Facility Lease was to refinance the principal debt at a lower cost, thereby passing those savings to the ratepayers. Reilly Trial Testimony. The Town’s right and obligation to assume the WTP Lease upon exercise of the purchase option under the Charter remains unchanged.
31. The WTP treats seven million gallons of water per day. With some minor exceptions, all of the water from tiie water distribution system serving Hingham (and Hull) goes through the WTP. The water is stored and then pumped to two areas through more than 200 miles of pipe. These combined distribution assets and infrastructure are referred to as the utiliiy plant in service, or “gross plant” on many Aquarion accounting schedules. As described above, Aquarion Mass, also holds the intangible assets of the leasehold interest in the WTP and business records. Walsh Trial Testimony; Atland Trial Testimony; Dixon Trial Testimony.
32. The WTP is an integral part of the Hingham water system and is essential to the operation of that system. Young Trial Testimony; Trial Exhibit 20.
33. I find no evidence in this trial record that the Defendants set up a separate company to build and own the WTP in an effort to deprive the Town of its rights under the Charter.
The First Years of Operation of the Water Company
34. The first financial report for the Hingham Water Company for the period ending June 30, 1880, showed that $37,130 was raised through capital contribution and $34,497 was spent on account of construction of the water system. Trial Exhibit 124; Jenkins Trial Testimony.
35. The first financial report for the Hingham Water Company for the period ending June 30, 1880 showed that there was no debt used in the first years construction payments. Id.
36. The financial report for the Hingham Water Companyforthe period endingJune30,1881, showed that $66,870 was raised through capital contribution and $51,131.84 was spent on account of construction of the water system. Trial Exhibit 125.
37. The financial report for the Hingham Water Companyforthe period ending June 30, 1881, showed that there was no debt used in the second year’s construction payments. Id.
38. The financial report for the Hingham Water Companyforthe period ending June 30,1882, showed that $16,000 was raised through capital contribution which was in addition to the $18,030.72 cashbalance, and $21,547.97 was spent on account of construction of the water system. Trial Exhibit 129.
39. The financial report for the Hingham Water Companyforthe period ending June 30,1882, showed *208 that there was no debt used in the third year’s construction payments. Id.
40. The first dividend for the Hingham Water Company was voted at its meeting of July 25, 1881. Trial Exhibit 126.
41. The Hingham Water Company had a dividend for the year 1882 of $6,000, which amounts to 5% of the amount of money contributed for common stock ($6,000 to $120,000). Trial Exhibit 65A.
42. The Hingham Water Company had a dividend for the year 1883 of $7,200, which amounts to 6% of the amount of money contributed for common stock ($7,200 to $120,000). Id.
43. The Hingham Water Company had a dividend for each of the years 1864 through 1903 of $7,200, which amounts to 6% of the amount of money contributed for common stock ($7,200 to $120,000). Id.
44. The Hingham Water Company had a dividend for each of the years 1905 through 1909 of $9,000, which amounts to 6% of the amount of money contributed for common stock ($9,000/$150,000). Id.
45. For the twenty-seven (27) years after its first dividend, the Hingham Water Company consistently distributed a 6% dividend (with only a couple of minor exceptions) based upon the money contributed for common stock. Id.
Depreciation
46. Depreciation expense was taken by the Hingham Water Company going back to 1864. Trial Exhibit 65A; Jenkins Trial Testimony.
47. Beginning in 1909, the Hingham Water Company took a depreciation expense in every year. Id.; Trial Exhibit 65D.
48. In 1920, the Hingham Water Company treasurer reported that in order to bring the bookkeeping into accord with the requirements of modern accounting he made several transfers related to depreciation. Trial Exhibit 137.
49. On the books of the Hingham Water Company depreciation represents a non-cash expense through which it, and its successors, have recovered the investment spent on plant. Jenkins Trial Testimony.
50. As a matter of general accounting principles, depreciation is deducted from revenue. Dixon Trial Testimony.
51. In the context of this dispute, operating revenue is the money that comes into Aquarion Mass from the sales of water. Guastella Trial Testimony. Aquarion Mass subtracts the depreciation from its operating revenue. Trial Exhibit 107 at AQ-033094; Trial Exhibit 105 at AQ-005163. Aquarion Capital also subtracts depreciation from its operating revenue. Trial Exhibit 108 at AQ-033079; Trial Exhibit 106 at AQ-023674.
52. Thus depreciation is an actual recovery by the water company of the price it paid for an asset over the life of that asset. Through depreciation, the water company gets back the money it paid for the original cost of the asset. Guastella Trial Testimony.
Corporate Property
53.Generally, corporate property includes all tangible and intangible property. Guastella Trial Testimony. For purposes of his opinion testimony in this case, the Town’s expert Carl Jenkins interpreted the meaning of the words “corporate property” in the Charter to mean all assets of the Hingham water system. Jenkins Trial Testimony.
Rulings of Law
Judge Sanders has previously noted that ”[n]o court has ever defined the term ‘actual cost’ as it appears in this particular Charter. The SJC has, however, defined that term in several cases involving other water companies.” Docket, Paper 19, at 4. The parties do not dispute that the SJC has addressed related issues raised by different water charters over the past one and one quarter century.[5] As the court and the parties have now discussed at some length,[6] this precedent provides the beginning, but not the end, of the analysis required.
There is no dispute that “[t]he general and familiar rule is that a statute must be interpreted according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers maybe effectuated.” Commonwealth, v. Mülican, 449 Mass. 298, 300 (2007), quoting Hanlon v. Rollins, 286 Mass. 444, 447 (1934). “Our primary duty in interpreting a statute is ‘to effectuate the intent of the Legislature in enacting it.’ ” Water Dep't of Fairhaven v. Department of Evtl. Protection, 455 Mass. 740, 744 (2010). The more than 100 water statutes passed during the late 19th century authorizing a city or town to purchase a water property franchise “differ considerably in their provisions as to the payments to be made,” as well as the procedures for arriving at a purchase price. Inhabitants of Tisbury v. Vineyard Haven Water Co., 193 Mass. 196, 200 (1906) (construing a different charter with more explicit price calculation terms).[7]
The parties further agree that the purchase price formula under Section 11 of the 1879 Charter here is not a valuation—where the analyst is determining a market price—but, rather, a calculation composed of a set of defined elements. The limited question, then, is which components fairly go into this price calculation—as the elements should be defined under this Charter, at this time, guided by the SJC precedent. To once again quote Judge Sanders, “(a]s those decisions make clear, the term ‘actual cost’ is not a technical term that has the same meaning in every context. [Rather] ‘[i]t is a general or descriptive term which may have varying meanings according to the circumstance in which it is used.’ ” Paper 19 at 4, citing Southbridge I, 371 Mass, at 215.
*209 Corporate Properly
The first element of the Hingham Charter formula that is disputed in this case is the term “corporate property.” The dispute arises because of the historical corporate separation of the water franchise itself (which began operating no later than 1880, and is now Aquarion Mass.), from the water treatment plant that followed (not beginning operation until 1996, as Aquarion Capital). The Town takes the position that the WTP is so “clearly a part of the water system” that the Town must be entitled to purchase it under the Charter. Plaintiffs Proposed Conclusions of Law at para. 35. It accuses the Defendants of having “simply move[ed]... an integral part of the water system, into a shell company,” thereby attempting to deprive the Town of its right to purchase, citing Braintree, 146 Mass, at 487. Id.
As noted above, there is no evidence on this trial record that the Defendants set up a shell company for the purpose of evading the terms of the Charter. To the contrary, the record reflects multiple independent business reasons for having established Aquarion Capital such as: the cost of the delay to construct a stealth plant as demanded by the townspeople; the mortgage indenture limitations of Mass-American; and the bond offering of Mass Capital.
But this does not mean the Defendants have the better of the legal analysis. Defendants argue the fact that the Town may assume the Facility Lease, combined with the law of veil-piercing,[8] precludes the Town from acquiring the WTP other than by paying fair market value through eminent domain, because the WTP is “outside the ‘corporate property’ ” of Aquar-ion Mass., and “[a]t the time of the drafting of the 1879 Charter, no water treatment plant was envisioned.” Aquarioris Request for Findings of Fact and Rulings of Law (Aquarioris Request), at para. 128. I disagree. Neither the legislative history of this Charter nor my reading of the SJC precedent persuades me that the Town must forego its statutory entitlement and resort to eminent domain to acquire the WTP on these facts.
The closest precedential analogy I see is the Ded-ham water case, decided in 1985. That 1930 statute gave that town “the absolute right at any time to purchase the franchise, property and all the rights and privileges of the Dedham Water Company within the limits of the town.” Plans for the Dedham water treatment plant obtained regulatory approval in 1982. The SJC affirmed the trial court’s determination that the town of Dedham had an obligation to purchase all of the company’s assets, including the treatment plant, despite the fact that portions of the plant were located in the neighboring town of Westwood. The Court noted the statutory term “corporate properly” was not modified or limited in any way, and interim legislation did not expressly modify that language. The SJC also noted that Dedham’s apparent object was to “dismember an existing water company” so as not to be responsible for the cost of cleaning up a contaminated water supply via the treatment plant. 395 Mass, at 521.
I acknowledge these parties’ positions are reversed from those in Dedham, and that the corporate structure in Dedham apparently involved only one entity. Nonetheless, the equitable spirit of the Court’s reasoning there is persuasive to me here. Aquarioris position to prevent Hingham from acquiring the WTP by means of the Charter provisions would also “dismember” an existing water system. The argument would also more generally allow private companies to agree to corporate structures, for whatever business purpose, which could then result in “depriving” towns of their statutory exercise. Braintree, 146 Mass. at 488. (“The corporation might go on under its charter, and make any proper construction of its works, and for conducting its business. No contract that it might make could deprive the town of the right to purchase its property and franchise under the statute.”)[9] I agree with Judge Sanders, in that this is one example of a reading of statutory language that ignores “times do change, and what made sense back in 1879 may not make sense today.” Paper 19 at 6.
Today water treatment plants are an integral part of water systems. The fact that this could not have been envisioned in 1879 does not control. Oxford, 391 Mass, at 588-89 (“What was reasonable in 1904 may be far from reasonable in 1984, and it may he necessary to use some method other than that provided by the statute to effectuate the statute’s purpose”). I therefore rule, contrary to Defendants’ requested declaration, that the WTP is not “outside the terms of [the statutory] purchase price formula,” and is required to be sold to the Town as part of Hingham’s exercise of its rights under the 1879 Statute.[10]
The parties would otherwise appear to agree that corporate property includes all tangible and intangible property. Plaintiffs Proposed Findings of Fact, at para. 125, citing the Trial Testimony of one of Defendants’ expert witnesses, Mr. Guastella; Jenkins Trial Testimony. Cohasset teaches that we return to the words of the Charter. There the Court held: “under the terms of the charter the property to be purchased by the town embraces all the properly of the company, including cash, bills receivable, and other intangible personally.” Cohasset, 321 Mass. at 149. This Charter plainly and unambiguously states the Town shall have the right to purchase “the corporate properly, and all the rights and privileges of said company at the actual cost of same, together with interest thereon.”
Actual Cost
The parties do not really dispute that, conceptually, “actual cost” means the original cost of the corporate property, and I so rule. Aquarioris Request at para. 87; Falmouth, 180 Mass. at 331; Southbridge I, 371 Mass. at 216 (“original cost of plant, less accrued depreciation and less certain other deductions”); Oxford (“It seems quite clear on the record before us, that in 1904 the Legislature intended actual cost to mean original cost, the amount originally paid”).[11] Nor do *210 they dispute that in general terms water statutes like this Charter were designed to reimburse a private water company for its investment in the property. Plaintiffs Proposed Conclusions of Law at paras. 9-13; Aquation's Request at pares. 86-88, 91; Oxford, 391 Mass, at 588, 592 (‘The intent of the Legislature, then was to reimburse the company for its investment”); Southbridge I, 371 Mass, at 215-16 (the amount of the company’s investmeht on which it is entitled to earn a fair and reasonable return); Tisbury, 193 Mass. at 198 (“the effect of this method is to give the investors the amount of their original investment with simple interest”).
Likewise the parties agree that deriving actual cost is an accounting exercise distinct from appraising a property or assets for purposes of establishing fair market value in a current transaction between willing buyer and seller. Plaintiffs Proposed Conclusions of Law at para. 13; Oxford, 391 Mass, at 588 (statute intended to provide that price to be paid by the town should not depend upon opinions as to the market value of the property when taken but should be restricted to what it had cost the company). As is so often the case, the devil lies in the definitional detail of the component parts of the pricing formula. Id., at 589 (“Having established that the purpose of the Legislature in 1904 was fairly to compensate the investors for their investment, we must determine what method of calculation, in 1984, will best achieve this purpose”). Thus I will next address certain of the subsidiary components in dispute.
Depreciation
The more modern of our SJC water charter precedent is explicit on the topic of depreciation. In Southbridge I, the water company contended that “actual cost” must include every expenditure made by the company, “the full cost of the creation of the present system in its present condition," and therefore there should be no reduction in actual cost “on account of depreciation, rates, or anything else.” 371 Mass, at 215. The Court determined that depreciation should be deducted:
Rather, we are inclined to adopt generally the town’s suggestion that we in effect define actual cost in substantially the same terms as are employed regularly by the Department of Public Utilities and approved by this court in determining the rate base of the company and of other regulated utilities in the Commonwealth for rate setting purposes. The rate base, or the amount of a company’s investment on which it is entitled to earn a fair and reasonable return is computed generally on the basis of original cost of plant, less accrued depreciation and less certain other deductions, and is derived from the company’s book figures. Such a definition, in contrast to that which the company urges us to adopt, would take into consideration the depreciation accrued on capital items over the years and recovered by the company through the rates which it has been permitted to charge its customers and would thus eliminate the possibility of a double recovery by the company for those items on which depreciation in fact has been taken.
Id., at 216.
Eight years later in a case involving a different charter, the Court “[did] not feel bound to accept... [Southbridge Is] definition of ‘actual cost,’ ” and reconsidered the definition in light of the facts and arguments applicable to that case. Oxford, 391 Mass. at 586. For one thing, the Oxford record did not demonstrate to the Court that depreciation had been included in determining the company’s rate for the period in question. Id., at 590 n.8. For another, the Court stated that the only reason in that case to deduct accrued depreciation would be to prevent a windfall to the company. Id., at 590. The Court later made explicit, however, that Oxford did not overrule, but instead distinguished Southbridge I. Southbridge n, 411 Mass. at 677.
It is undisputed that depreciation was not recognized as an accounting concept in 1879 when this Charter was drafted. Thus it is not surprising that the word itself does not appear in the statute. From this reality, however, Aquarion proceeds to argue a rather surreal point: “there is no evidence that current accounting understandings of depreciation—as a straight-line recovery of the original cost—was a concept known to the lawmakers in 1879.” Aquarion’s Request at para. 109. Here again, the fact that developments in depreciation accounting were not envisioned in 1879 does not control. Rather, the words “actual cost” which do appear in the statute “must be considered in connection with the cause of [the Charter’s] enactment, the mischief or imperfection to be remedied and the main object to be accomplished.” For purposes of this consideration, “it may be necessary to use some method other than that provided by the statute to effectuate the statute’s purpose.” Oxford, 391 Mass. at 588.
My reading of all the available authority is that the object of this and other water charters during the relevant time was to provide to local citizenry an opportunity—of their own time and choosing—to purchase, to establish, and to control a public water utility, while returning to private business people the investment which had been made to provide that service in the interim between the statutory enactment and a town’s election to purchase. The record here is more than sufficient that the Aquarion Defendants and their predecessors have already received any depreciation recovery due on their respective investments. Accordingly, depreciation is appropriately deducted in the formulaic calculation of actual cost to be paid by the Town.
Debt
The parties argue two issues about debt: 1) May assumption of outstanding debt be included as an element in the price calculation in favor of the Town. (Oxford, 391 Mass, at 592 (“the town may assume . . . mortgage bonds as part of the purchase price”)); and 2) should the Aquarion Defendants receive the benefit of interest calculated annually on that debt?
*211 Aquarion argues that how the property purchase was (originally) funded by the private entity (whether by capital infusion or by debt) is “not relevant to the issue of actual cost. The Town’s removal of debt from ‘actual cost’ and adding it in at the end of the purchase price calculation is not the result contemplated by the Legislature.” Aquarion’s Request at para. 115. Aquar-ion also accurately notes that while some charters explicitly address debt assumption, see, e.g., Cohasset, 321 Mass, at 139, this Charter does not.[12] Finally, it notes that although debt may theoretically be used to increase returns (or dividends), because dividends are statutorily subtracted out to arrive at actual cost, the Town’s position on price credit for debt would result in “creating a disparity in the formula that cannot be reconciled with the language of the 1879 Charter.” Aquarion’s Request at para. 116. Aquarion also attempts to distinguish “the regulated utility model” from other theories of cost accounting.[13]
The Town counters with two simple arguments: Oxford indicates a town may assume debt as part of its payment of the formula price; and debt (whether for the WTP or any other part of the water system) is not an actual cost, and thus interest on debt is in effect compound interest, which would lead to a windfall to Aquarion. Plaintiffs Proposed Findings of Fact at paras. 181-83; Plaintiff s Proposed Conclusions of Law at paras. 27-28; Reilly Trial Testimony (debt for the water treatment plant “is not a cost at all”).
I rule that assumption of debt should be excluded from the price calculation. Although I of course respect that the Town may choose to assume debt, there is no provision in this Charter for it to do so, as distinguished from the statutes considered in other cases. I am also concerned about the difficulties with calculation of potential debt assumption in this case, where the debt is not specific to the Hingham water system, but was part of the entire 2007 acquisition. Jenkins Trial Testimony. I accept, however, the Town’s argument with respect to interest on debt, and rule that any such interest should be excluded from the price calculation. Falmouth, 180 Mass, at 332 (“[I]t is true that actual cost excludes everything in the nature of profit”).
The Calculation of Actual Cost Admissibility of Jenkins Testimony
Defendants challenge virtually every aspect of the Town’s methodology and calculations for arriving at actual cost, including a Daubert challenge to the admissibility of the various expert opinions (four) proffered by Town witness Carl Jenkins. Of our five foundational requirements for admissibilily of expert opinion Aquarion appears primarily to focus on two: the “fit” of Jenkins’ reasoning and methodology to the facts of this case as a matter of plain English and common sense" (Memorandum in Support of Amended Motion to Exclude, at page 2); and the overall reliabilily of Jenkins’ theories given the particular nature of this properly, his limited experience costing such a property,[14] and the applicable legal precedent addressing water company charters. Mass. Guide to Evid. Section 702; LightLab Imaging, Inc. v. Axsun Technologies, Inc., 469 Mass. 181, 189 (2014); Commonwealth v. Barbosa, 457 Mass. 773, 783 (2010).
On the question of “fit,” Defendants argue that “none of the operative terms of his [Jenkins’] Opinion[s] appear in the Charter.” Memorandum in Support at page 3. Regarding reliability, Defendants argue “[a]ll three of Mr. Jenkins’ opinions are inadmissible as a matter of law because they are contrary to established Massachusetts law that defines ‘actual cost’ as the original cost of a company’s ‘corporate property.’ ” Id. at page 7.
For the reasons discussed both above and below, I decline to exclude Jenkins’ opinions wholesale from this bench trial. Mr. Jenkins is a highly qualified forensic accountant. He is not a lawyer, and did not receive instruction from counsel to apply any particular meaning to the statutory language. Jenkins nonetheless familiarized himself with certain of the SJC precedent potentially applicable to this case, for purposes of attempting to offer to the court calculations of actual cost. He “looked at the alternatives of what actual cost could be given the facts and circumstances.” Jenkins Trial Testimony. Jenkins’ calculations are based in a fully disclosed set of alternative assumptions made by him about the proper treatment of water company assets and the words of the Charter. As such his work assists the trier of fact, and is based on facts or data of the type reasonably relied upon by forensic accountants.
Whether or not the assumptions the witness made square with what the court’s reading of the Charter should be is the stuff of able advocacy, and has been fully explored on this trial record. From my point of view, assessment of the admissibility and potential assistance of Mr. Jenkins’ opinions differs not at all from those opinions offered by the defense experts. Each witness based his opinions on potential interpretations of the Charter, and his particular experiences with assessing the cost of various forms of property in various contexts. Each then used this foundation to assign values (or, in the case of Mr. Guastella, to critique values assigned) to elements he believes should be included in this statutory price formula. I am grateful for each of their contributions, and accord each opinion the weight I believe it is due, based on all of the record evidence before me and for reasons discussed here.
Actual Cost Derivations Presented by the Parties
As alluded to above, the parties have a fundamental conceptual dispute over how to derive “actual cost” that extends well beyond the subsidiary components of the formula I have addressed so far. They dispute what actual cost is, to whom, and many remaining details about its calculation.
*212 Aquarion’s purchase price formula expert, Mr. Reilly,[15] opined that “original cost means historical cost means actual cost which is the actual expenditure paid by the then owner of the property when the property was originally purchased or originally constructed, and originally placed in service.” Reilly Trial Testimony. Reilly went on to apply Defendants’ view of the Charter formula, based on his definition of actual cost, in the followirig manner: He derived the actual cost of the “gross plant and equipment”[16] in existence (subtracting the value of both CIAC and advances); he applied 10% interest year by year to the actual cost of the corporate property in existence at the end of each year; and then subtracted the total dividends paid to investors. The total purchase price arrived at through this methodology, for the version including the values assigned to the WTP, is $191,880,000.[17]
The Town’s expert, in contrast, derived actual cost by assessing contributed equity in alternative ways. For purposes of Jenkins Opinion #1, the witness calculated “allocated equity” from the last 100% sale of entity stock in the 2007 transaction, arriving at a price of $58,698,211.[18] Trial Exhibit A for I.D. For purposes of Jenkins Opinion #2, the witness calculated contributed equity (defined as common stock and paid-in-capital) going back to 1879, arriving at a price of $51,758,082. Trial Exhibit B for I.D. And, for purposes of Jenkins Opinion #3, the witness calculated a “net plant” cost (after depreciation), with interest based on contributed equity over the relevant time frame, arriving at a purchase price of $58,451,615. Trial Exhibit C for I.D.; Jenkins Trial Testimony; Aquarion’s Request at paras. 63 and 79.[19]
Aquarion’s “rebuttal” to the Town’s actual cost calculations is multifaceted. First, with respect to Jenkins Opinion #1, the Defendants through their experts “disagree[s] that equity investment is actual cost of corporate property.” Second, they believe Jenkins wrongly allocated debt across the entities acquired in 2007. Third, they believe Jenkins wrongly excluded reinvested retained earnings. Fourth, they assert that even a stockholder equity component would include more than just the purchase price of the stock. Aquarion’s Request at paras. 71-75. With respect to Jenkins Opinion #2, Defendants reiterate that “contributed equity is also not actual cost of the utility facilities," and that Jenkins is not appropriately including “all sources of stockholder equity.” Aquarion’s Request at paras. 77-78. Defendants fault Jenkins Opinion #2 for deducting depreciation, because in their view this derivation arrives at “book value, ” as distinct from actual cost. They further argue that calculating interest based on contributed equity (instead of net plant) is wrongly mixing the foundational basis for that interest, Aquarion’s Request at paras. 79-82.
The Town’s opposition to Aquarion’s accounting evidence is essentially that all of Aquarion’s expert witness calculations were based on Charter term definitions provided by counsel, rather than on the forensic witnesses’ own independent thought or expertise.
Resolution of the Statutory Formula Methodology
The parties agree it is this trial judge’s role (initially),[20] and not the role of either side or their accountants, to construe the contract created by the provisions of the 1879 Charter. Key to that construction is determining a fair and reasonable method for calculation of “actual cost” on these facts. Oxford, 291 Mass. at 589 (“Having established that the purpose of the Legislature in 1904 was fairly to compensate the investors for their investment, we must determine what method of calculation [in 2015] will best achieve this purpose”). Based on all of the record evidence and authority before me, I rule as follows.
Plaintiffs Jenkins Opinion #1 (characterized as “the 2007 actual equity invested by the current controlling owner approach”), has a certain conceptual appeal. The party before the court, Aquarion Mass, placed a value on the water system in 2007 and, as a result of that assessment, paid an “actual cost” for the equity it acquired in that system. Those figures are recent and readily available, and as such carry the appearance of reliability. Oxford, 391 Mass, at 589 (“In [determining the method of calculation] we must keep in mind that the Legislature also intended that the compensation be easily and accurately calculable”). However, Defendants are correct that this expediency masks fundamental flaws with the analysis. It cannot be disputed that “value,” “equity,” and “cost” are not the same thing—in plain English of any century, or in accounting language. Likewise, corporate property is statutorily defined in this Charter in terms of assets, and the stock Aquarion Mass, received in the 2007 transaction is not properly viewed as an asset of the water company. Jenkins Trial Testimony; Guestella Trial Testimony; Aquarion’s Request at para. 64. Moreover, because the former Aquarion Company owned more than one water system, Jenkins Opinion #1 required allocating the “equity piece of that acquisition to the Hingham system and the WTP.” Jenkins Trial Testimony. And that in turn spawns multiple allocations and assumptions about the investment. Aquarion’s Request at paras. 66-69. Jenkins went on to make allocations of EBITDA and debt retirement, which are disputed by the Defendants to the tune of tens of millions of dollars. Id., at paras. 69-70, 72. Defendants point that “[tjhis demonstrates the sensitivity of Mr. Jenkins’ assumptions on the final calculated formula purchase price,” id., at para 72, is well taken. For all of these reasons, I am not persuaded the methodology of Jenkins Opinion # 1 is fair or reasonable on these facts.
Plaintiffs Jenkins Opinion #2, in contrast, appears to reflect an understanding of historical investment from the perspective of the 1879 statutory intent. Jenkins considered “all of the equity contributed to the company back to 1879,” characterizing Opinion #2 as *213 “the contributed equity going back to 1879 approach.” Opinion #2 purports to include equity contributed by any stockholder of the Hingham Water Company from 1879 to 2013. Defendants’ rebuttal remains essentially the same, however, because “contributed equity is not actual cost of the utility facilities,” and because certain sources of stockholder equity (common stock, paid-in capital, and retained earnings and depreciation) are not included. Aquarion’s Request, at paras. 77-78. When Guastella “adjusted” Jenkins Opinion #2 for this latter concern, Guastella arrived at a purchase price more than double that of Jenkins ($123,550,536 compared to $51,758,082). Id., at para. 78. For all of these reasons, I am not persuaded the methodology of Jenkins Opinion #2 is fair or reasonable on these facts.
Jenkins Opinion #3 is simpler, and appears more consistent with a common sense understanding of actual cost than either Opinion #1 or Opinion #2. Opinion #3 calculates the cost of the assets which comprise the “net plant” as the appropriate basis for actual cost. However, some of the criticism Defendants level at the calculation formula used in Jenkins Opinion #3 is also well taken. When subtracting accumulated depreciation from the number for “gross plant,” Jenkins did not conduct an allocation among the Aquarion Mass, assets. More significantly, however, when calculating the 10% interest element of the formula for purposes of Jenkins Opinion #3, Jenkins used his contributed equity calculations (from Opinion #2) as the basis. As Mr. Guestella (who critiqued the Jenkins Opinions, but did not offer calculations of his own) testified, “If you’re going to, if you will, use as a substitute for actual cost, net plant then it seems to me that the percent of 10 percent should be applied to the net plant figures over the course of the years rather than changing the basis for the 10 percent and using contributed equity.” Guestella trial Testimony; Aquarion’s Request at para. 81.[21]
I agree with Defendants that this latter point compromises the purchase price reflected by Jenkins Opinion #3. It seems clear to me that by its terms the Charter requires the ten per cent interest be applied to whatever the annual actual cost of the corporate property is calculated to have been. Jenkins Opinion #3 improperly calculates interest for net plant on the equity value which was arrived at for the water system in Jenkins Opinion #2 by means of an entirely different methodology. If net plant is the most reasonable proxy basis for deriving the actual cost of corporate property in one part of the formula, it must then remain the basis in another part of the formula. Reilly “recalculated” actual cost based on what the Defendants describe as “the actual net plant,”[22] although Reilly emphasized this was not in his opinion the way it should be done. When he used a 10% return on his version of net plant, the purchase price Reilly arrived at is $139,620,000. Reilly Trial Testimony; Trial Exhibit M for I.D.
From all of the work the parties have done, I conclude that net plant is indeed the most fair and reasonable derivation of actual cost under this Charter. Although Guestella criticized the net plant methodology for arriving at “book value,” this method was approved in Southbndge I, and referenced again as a possible measure, albeit not adopted, in Oxford. The Town has met its burden by a preponderance to persuade me that the net plant methodology is fair and reasonable under all of the circumstances of this case. I find no basis for concluding on this record that it is unfair to these Defendants under this Charter.
All that said, I must decline the parties’ invitation to act as an accountant to calculate and to declare a purchase price as part of this opinion. Based on these rulings, I cannot accept any of the multiple alternative prices (rangingbetween $58,451,615 and $ 191,880,000) offered by the parties. A modified set of calculations is now required for purposes of a final judgment in this matter. The parties are far better suited to such a task than I could ever be. The parties shall therefore cooperate to submit a Proposed Final Judgment with respect to the appropriate purchase price for the assets of Aquarion Mass, and Aquarion Capital in whatever detail they deem appropriate, but consistent with these Findings and Rulings, no later than forty-five (45) days from today.
Conclusion and Declarations
For all of the reasons stated, the court concludes and declares as follows:
Actual cost means original cost to the water company;
The water treatment plant owned by Aquarion Capital must be sold to the Town as part of Hingham’s exercise of its rights under St. 1879, c. 139;
Depreciation is to be deducted from the actual cost;
The appropriate calculation to derive the purchase price by which Hingham may exercise its right to purchase the water system under the Charter shall be based on “net plant,” with simple interest calculated year by year; and
Aquarion is entitled to the statutory simple interest of 10% return on its actual cost.[23]

 he parties stipulated to a waiver of jury trial. Docket, Paper 20. The court heard ten witnesses and approximately 70 exhibits were admitted into evidence.

 The Complaint requested the court declare: (1) “(t]he appropriate calculation and purchase price under St. 1879, c. 139 for Hingham to purchase its public water system”; and (2) “(w]hether the water treatment plant, owned by Aquarion Capital, must be sold to the Town as part of Hingham’s exercise of its rights under St. 1879, c. 139.” Id., para. 35. Aquarion’s Answer requested, among other things, a declaration: (1) “that ‘actual cost’ means ‘original cost’ to the water company”; (2) “that depreciation is not deducted from the actual cost”; (3) “that the ratepayers do not acquire any interest in the company property by paying rates”; and (4) “that Aquarion is entitled to a 10% return on its actual cost.” Docket, Paper 8 at p. 15.

 CIAC represents assets that were not actually paid for by the water company; but instead by someone else. CIAC generally consists of developer-funded extensions of the *214 water distribution system, whereby a developer installs the infrastructure, andimay receive certain advances back from the water company. Any money that is not returned to the developer is accounted for as CIAC and tracked as such. Aquarion tracks its CIAC as a deduction to rate base. While the company has no “original out of pocket expenses” for this property, it considers it to be an “investment” because it maintains CIAC, pays property taxes on it, and treats it the same as its other assets. Nonetheless, the cost experts for both sides excluded CIAC from their calculations. Reilly Trial Testimony; Dixson Trial Testimony; Jenkins Trial Testimony.

 Charles W.S. Seymour, who authored the “Water-Works” chapter of the book entitled History of the Town of Hingham, Massachusetts, was bom in Hingham in 1839 and was “Superintendent of Hing. Water Company,” “Surveyor,” and “for sev. yrs. selectman.” Trial. Exhibit 64 at para. 2; Trial Exhibit 7 at p. 145.

 The parties agree that the (potentially) instructive universe of precedent is as follows, allofwhichlhave considered: Braintree Water-Supply Co. v. Town of Braintree, 146 Mass. 482 (1888); Newburyport Water Co. v. City of Newburyport, 168 Mass. 541 (1897); Town of Falmouth v. Falmouth Water Co., 180 Mass. 325 (1902); Inhabitants of Tisbury v. Vineyard Haven Water Co., 193 Mass. 196 (1906); Opinion of the Justices to the Senate, 300 Mass. 607 (1938); Cohasset Water Co. v. Town of Cohasset, 321 Mass. 137 (1947); Town of Southbridge v. Southbridge Water Supply Company, 371 Mass. 209 (1976) (Southbridge 1); Town of Oxford v. Oxford Water Company, 391 Mass. 581 (1984); Dedham Water Company v. Town of Dedham, 395 Mass. 510 (1985); Town of Southbridge v. Southbridge Water Supply Company, 411 Mass. 675 (1992) (Southbridge ID; Town of Edgartown v. Edgartown Water Company, 415 Mass. 32 (1993).

 I am grateful to both sides for their detañed presentation of the applicable factual and legal history.

 For example, some statutes provide for the appointment of three commissioners to arrive at a purchase price. Braintree, 146 Mass, at 482, 486; Newburyport, 168 Mass. at 552; Cohasset, 321 Mass, at 139. And some are based on “fair value” rather than actual cost. Newburyport.

 Aquarion raises the specter of vefl piercing, without seriously arguing its elements. Scott v. NG US 1, 450 Mass. 760 (2008). Neither side addresses successor liability. Milliken & Company v. Duro Textiles, LLC, 451 Mass. 547, 560 (2008) (“Equitable remedies are flexible tools to be applied with the focus on fairness and justice . . . Under principles of equity, a court will consider a transaction according to its real nature, looking through its form to its substance and intent”). In particular, Defendants do not address how these equitable doctrines might inform the somewhat equivocal connection here between eminent domain and water charter jurisprudence (which is based on a private company’s assent to the purchase by a town through the contract of the charter). Opinion of the Justices, 300 Mass, at 612; Braintree, 146 Mass, at 424 (“The authority conferred was not the power to take property by an exercise of the power of eminent domain, but it was somewhat analogous to it”); Oxford, 391 Mass, at 589-90, and nn. 5-6.

 I have also considered the contract analysis offered by the 1938 Opinion of the Justices, 300 Mass, at 612-13. I appreciate Aquarion Capital is not literally a party to the contract created by the Charter, whereas Aquarion Mass.—by virtue of being a direct water company successor—is, but I do not find this distinction controlling.

 This ruling necessarily negates Aquarioris work to establish the fair market value of the WTP using a cost approach, since that is not the measure required by the statute’s “actual cost” language. Aquarioris Request at paras. 56-62.

 That said, they do dispute cost to whom, and how to calculate it. Jenkins Opinion #1 calculates contributed equity by the most recent investor, Aquarion. Jenkins Opinion #2 calculates all of the equity contributed to the water company by any investor going back to 1879. Jenkins Opinion #3 is based (in part) on a different methodology, using “net plant” as the basis. Defendants’ witnesses advocate calculating original cost of the asset to the party first devoting it to public use. Aquarioris Request at para. 71; Guastella Trial Testimony.

 Aquarion points out that “[t]he Charter does not exclude borrowing funds as one way that capital can be funded.” Aquarioris Request at para. 114. See also Opinion of the Justices, 300 Mass. at 614 (payment by assumption of debt very different form than that agreed to in the 1879 Charter).

 Defendants’ expert witness Guastella testified that debt “actually has the opposite effect” on a utility model. Aquarioris Request at para. 117.

 Mr. Jenkins has not worked on other water company matters, including rate disputes.

 Ihree experts testified for Defendants. Mr. Reilly performed independent calculations for a purchase price formula, based on components defined and provided to him by counsel. Mr. Guastella neither prepared nor provided calculations of his own, but simply critiqued Jenkins’ methodologies. Mr. Altland was tasked with developing a fair market value for the WTP.

 Gross plant is a term used by the parties to mean the “total plant on the balance sheet” of Aquarion (that is, all of the infrastructure of the water system, plus leasehold interests and records), submitted by Defendants as foundation for the expert report of Mr. Reilly. Jenkins did not himself have access to all of this raw data. Jenkins Trial Testimony; Aquarioris Request at para. 28.

 This calculation includes other judgments made by Reilly to exclude retired property or assets no longer in service, but to include a “return” (interest) on the restricted cash account associated with the WTP (eliminated in 2011). Trial Exhibit L for I.D.; Aquarioris Request at para. 55.

 Because the 2007 transaction involved more than just the Hingham water company, Jenkins performed an allocation based on the EBITDA he estimated for four entities. The trial record does not contain sufficient facts independently to calculate EBITDA for this transaction, although Jenkins testified he relied on 2005 financial statements for these four companies provided by the Defendants. Trial Testimony; Plaintiffs Proposed Findings of Fact at paras. 53-60; Aquarioris Request at paras. 68-69.

 Jenkins Opinion #4 performed the calculations reflected in Opinions #1-3 without the inclusion of the WTP. Jenkins Trial Testimony; Plaintiffs Proposed Findings of Fact at para. 118; Aquarioris Request at para. 83.

 This case was transferred to the BLS for resolution by order of a Single Justice of the SJC (Cordy, J.), where it was originally filed pursuant to G.L.c. 231A. Docket, Paper 1.

 Jenkins Opinion #4 consists of calculations based on the methodology used in Opinions #1-3, without inclusion of the WTP in the price.

 This is yet another example of the parties disputing certain component formula details. I do not address the question of what “actual net plant” should be, as I do not find this issue properly joined in the record, and believe the parties should be able to arrive at agreement about this component on their own.

 I decline to declare anything with respect to Defendants’ request about ratepayers’ interest in the company property, having heard insufficient record evidence on this issue.